# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>TARGET TELEPHONE ONE, a Samsung Cell Phone (Broken), Model SM-J120AZ UD, IMEI 356903080225449 S/N: R58J13G8FJK marked as evidence item #403877, held at Rocky Mountain Regional Computer Forensic Laboratory (RMRCFL), 9195 E. Mineral Avenue, Suite 300, Centennial, CO 80012, and more fully described in Attachment A. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 20-sw-1221-MEH |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the   State and   District of   Colorado   *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit
The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit
The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    X   evidence of a crime;

    X   contraband, fruits of crime, or other items illegally possessed;

    X   property designed for use, intended for use, or used in committing a crime;

    ☐   a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of 21 U.S.C. §§ 841(a)(1) and (b),843(b) and 846, and the application is based on these facts:

    X   Continued on the attached affidavit, which is incorporated by reference.

    ☐   Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*s/Stephanie Benitez*
*Applicant's signature*

Stephanie Benitez, FBI Special Agent
*Printed name and title*

Sworn to before me and:    ☐ signed in my presence.
                               ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:   10/14/2020

_____
*Judge's signature*

City and state:   Denver, CO

Michael E. Hegarty, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Stephanie Benitez, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1.      I am a Special Agent (SA) with the FBI, United States Department of Justice, and have been so employed since October 2002. I am currently assigned to the Denver Division of the FBI, specifically to the Public Corruption/Civil Rights/Organized Crime program. Prior to my assignment in Denver, I was a Supervisory Special Agent (SSA) in the Violent Crime and Civil Rights/Public Corruption Sections at FBI Headquarters, where I supervised federal Color of Law, Hate Crimes, Child Abductions, and Human Trafficking investigations for the FBI. Prior to this assignment, I was an FBI SA in Los Angeles, assigned to the West Covina Resident Agency Organized Crime/Violent Crime Squad. In this capacity I investigated kidnapping, extortion, and organized drug trafficking enterprises.

2.      On June 5, 2020 the Honorable Kristen L. Mix signed a search warrant authorizing a search of, among other devices, a Samsung Cell Phone Model SM-J120AZ UD, IMEI 356903080225449 S/N: R58J13G8FJK marked as evidence item #403877 (more fully described in ATTACHMENT A and referred to in this affidavit as the "TARGET TELEPHONE ONE") upon a finding of probable cause to believe that within that TARGET TELEPHONE ONE would be located the items described in ATTACHMENT B, being evidence, fruits, and instrumentalities of violations of federal drug laws including 21 U.S.C. § 841(a) and (b)(1) (Manufacturing, distributing, or possession with intent to manufacture or distribute a controlled substance); 21 U.S.C. § 843(b) (Use of a Communication Facility in a Drug Crime); and 21 U.S.C. § 846 (Conspiracy to commit a controlled substance offense) (collectively, the "SUBJECT CRIMES").  I'll refer to this as the ORIGINAL WARRANT.

3.      Since the time the search warrant was signed, the FBI has been diligently making efforts to execute the Court's search warrant.  The phone is, however, password protected and the suspected user of the device, ALEJANDRO "PRIEST" GUTIERREZ, is deceased.  In the past months, the Federal Bureau of Investigation has used several techniques and devices to obtain access to the TARGET TELEPHONE ONE.  None of these techniques has been successful.  I have since been advised by an FBI forensic examiner at the Rocky Mountain Regional Computer Forensics Lab that they may be able to bypass the phone's security features using a tool they call "In-System Programming" or "ISP", which is a technique that is used to solder components to the phone allowing for access. This technique involves disassembling TARGET TELEPHONE ONE by melting the solder on the board to loosen the memory and then extracting the memory card to play it in a memory card reader.  While this method has been useful in the past, using this technique will render the TARGET TELEPHONE ONE inoperable.  I therefore seek specific authorization to use this technique and other similar techniques as necessary to execute the ORIGINAL WARRANT.

4.      Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and

1

instrumentalities of violations of the SUBJECT CRIMES are located in the places described in ATTACHMENT A, specifically in TARGET TELEPHONE ONE.  Furthermore, because this subsequent warrant is submitted only to seek specific authorization to use the technique set forth in the paragraph above, paragraphs 8 to 27 below are substantially the same paragraphs submitted in the ORIGINAL WARRANT, updated as necessary to reflect the passage of time and this warrant's emphasis on TARGET TELEPHONE ONE.

5.     The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## IDENTIFICATION OF THE SUBJECT DEVICES TO BE EXAMINED

6.     The devices to be seized and searched are currently located at Rocky Mountain Regional Computer Forensic Laboratory (RMRCFL), 9195 E. Mineral Avenue, Suite 300, Centennial, CO 80012, TARGET TELEPHONE ONE was originally seized incident to the arrest of ALEJANDRO GUTIERREZ and the subsequent search of his vehicle, along with Target Telephone Two and Target Telephone Three all of which were described in the ORIGINAL WARRANT as follows:

a.     TARGET TELEPHONE ONE, marked as TPD evidence item #403877 and described as a Samsung Cell Phone (Broken), Model: SM-J120AZ UD, IMEI: 356903080225449, S/N: R58J13G8FJK.  This item was found near where the incident occurred and initially collected by Commerce City Police Department (CCPD) on 03/17/2017 and transferred to TPD on 8/29/2017.  It was transferred to the FBI on June 5, 2020 and is currently located at the RMRCFL.

b.     Target Telephone Two, marked as TPD evidence item #403876 and described as a Samsung Cell Phone, Model: SM-B3110.  This item was found in GUTIERREZ's truck and initially collected by CCPD on 03/21/2017 and transferred to TPD on 8/29/2017.

c.     Target Telephone Three, marked as TPD evidence item #403878 and described as a ZTE Cell Phone, Model: Z320, S/N:329F66092B9E.  This item was found in GUTIERREZ's truck and initially collected by CCPD on 03/21/2017 and transferred to TPD on 8/29/2017.

These devices were lawfully seized incident to arrest.  Furthermore, on May 16, 2017, the Westminster Police Department (WPD) received warrants from the State of Colorado, County of Adams Court for a search of each of the above devices.  However, as set forth below, technical limitations at the time prevented a full search.  As a result of this history, investigators might already have the necessary authority to examine the devices above, including TARGET TELEPHONE ONE, but I seek this additional warrant out of an abundance of caution to be certain that an examination TARGET TELEPHONE ONE using the techniques described above in paragraph 3 will comply with the Fourth Amendment and other applicable laws.

7.     I believe there is probable cause to believe that TARGET TELEPHONE ONE contains evidence, fruits, and instrumentalities of violations of the SUBJECT CRIMES. The applied-for warrant would authorize the forensic examination of TARGET TELEPHONE ONE, including the use of the technique described in paragraph 3, for the purpose of identifying electronically stored data particularly

described in ATTACHMENT B.

## THERE IS PROBABLE CAUSE TO BELIEVE THAT TARGET TELEPHONE ONE CONTAINS EVIDENCE OF SUBJECT CRIMES

8.      The NMTF is a federally funded law enforcement group that includes local police officers from eight different police and sheriff departments in Colorado that investigate drug trafficking organizations (DTO) throughout the State of Colorado.

9.      I have reviewed an affidavit submitted by Adams County Sheriff's Office Detective Richard Brookman to the County Court in Adams County on May 15, 2017.  In sum and substance and in pertinent part, the affidavit states the following:

a.      On March 16, 2017 Thornton police dispatch received a call from a STORE CLERK, later positively identified by the Thornton Police Department, as a clerk at the Western Convenience Store.  STORE CLERK reported that there were three trucks in the parking lot occupied by intoxicated individuals selling drugs.  STORE CLERK stated that one of the trucks was white and one was black.  STORE CLERK could not tell the color of the third truck.  During a later interview STORE CLERK explained that two separate customers had come into the store complaining about people smoking drugs on the north side of the store.

b.      A Thornton Police Officer who arrived on the scene saw a man, later identified as ALEJANDRO GUTIERREZ, associated with a black Silverado pickup truck in the parking lot.  The office chased GUTIERREZ and, upon catching him, fought with him for about 3 minutes before other officers arrived.  While GUTIERREZ was resisting arrest, he was tased by a sergeant from the Federal Heights Police Department who had responded to the scene.  GUTIERREZ subsequently stopped breathing and was transported to a hospital, where he died.

c.      Another office who arrived on the scene reported that were ten to twelve pounds of methamphetamine inside the black Silverado in plain view.  When a Commerce City Police detective later arrived at the scene, he saw several sealed Tupperware-type containers wrapped in plastic wrap and filled with a white substance that he believed to be narcotics.

d.      GUTIERREZ's personal belongings were searched.  During the search, investigators found $28,081.00 in United States currency, a small bag of what appeared to be diamonds, and a drug pay out sheet.

e.      On March 22, 2017 a Commerce City Police Department detective and a Commerce City Crime Scene investigator executed a search warrant on the black Silverado pickup truck, where they found two cells phone from the passenger compartment: Target Telephones Two and Three.  They also found nine individually wrapped plastic Tupperware-type containers, each of which contained a white crystal-like substance that field-tested positive for methamphetamine.  Combined, the containers held approximately 9.21 pounds of the presumptive methamphetamine. They also found a

container with 89.21 grams of substance that field-tested positive as heroin, 10.59 pounds of a substance that field-tested positive for marijuana, and two semiautomatic pistols.

        f.      TARGET TELEPHONE ONE was found lying near where the incident occurred.

10.     On March 20, 2020, I performed a criminal records check on ALEJANDRO GUTIERREZ and learned he had an extensive criminal history to include but not limited to multiple counts of attempted murder, assault with a firearm, home invasion, malicious destruction of property, burglary, larceny, false reporting, vehicle theft, fraud, trespassing, impersonation, aggravated motor vehicle theft, menacing with a deadly weapon, flight escape, possession of controlled substance-meth, failure to remain at the scene of a hit and run, and second degree kidnapping.

11.     On or about March 25, 2020, I contacted TPD Commander Marilee Bella regarding, ALEJANDRO "PRIEST" GUTIERREZ. Through the reading of reports and my discussion with Commander Bella, I learned the following:

        a.      On March 16, 2017, the TPD dispatch received a call regarding a suspicious vehicle. An Officer responded to the location of 91st and Huron Street in the City of Thornton. Upon contact with ALEJANDRO GUTIERREZ, a short foot pursuit ensued. Once the officer caught up with GUTIERREZ, there was a hand-to-hand altercation. At some point, an electronic control device was deployed. GUTIERREZ was reportedly handcuffed at which point he complained of difficulty breathing. GUTIERREZ became unresponsive and was transported to a local hospital where he died. According to the Office of the Coroner, GUTIERREZ's cause of death was Methamphetamine-Induced Excited Delirium. At the time of his death, GUTIERREZ had approximately $28,081.00 US currency, a drug pay-out sheet, and what appeared to be miscellaneous diamonds strapped to his leg. Near where the incident occurred, officer located TARGET TELEPHONE ONE. On March 22, 2017, Commerce City Police Department Detectives executed a search warrant of GUTIERREZ's vehicle where inside they found Target Telephone Two, Target Telephone Three, ledgers, notebooks, two handguns, and a large quantity of suspected methamphetamine, heroin, and marijuana, all which were field tested presumptive positive.

        b.      The incident was assigned TPD Case Number 2017004055. The incident was reported as a second degree assault on a police officer by ALEJANDRO GUTIERREZ. Commander Bella informed me that GUTIERREZ's family has made no requests for the remaining items of evidence held at the TPD.

        c.      I reviewed photographs of GUTIERREZ taken during his autopsy and noted a tattoo located on his right wrist "SUR" and on his chest "13". I know, from my training and experience, that both of these tattoos are commonly denoted as markings associated with Surenos gang members.

12.     On March 30, 2020, I met with Commander Bella to review evidence associated with GUTIERREZ that was then located in the TPD Evidence lockup. Specifically, I viewed five items of evidence to include: TARGET TELEPHONE ONE, Target Telephone Two, and Target Telephone three; item #403874 which included papers and notebooks; and item #403875 which was GUTIERREZ

black wallet which included cards and papers.  The papers and notebooks included what appears to be drug ledgers, phone numbers of at least one other known drug dealer, and letter art reading "Priest".

### THERE IS PROBABLE CAUSE TO BELIEVE THAT EVIDENCE, FRUITS, AND INSTRUMENTALITIES OF THE SUBJECT OFFENSES WILL BE FOUND IN TARGET TELEPHONE ONE

### I.    Background:  Technical Terms

13.    Based on my training and experience, I know that a cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites.   Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices.  A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices.  A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords.  Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts.

14.    Cellular telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet.  They may also include GPS technology for determining the location of the device.  Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data.  Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations.  Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications.  Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.  Some cellular telephones also contain digital cameras and software related to the taking of digital photographs.  Smartphones thus may contain in one device the functions of the following devices:

a.    *GPS Navigation devices.*  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records of the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely

5

accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

       b.     *Personal Digital Assistants.*  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include GPS technology for determining the location of the device.

       c.     *Tablets.*  A tablet is a mobile computer — typically larger than a phone yet smaller than a notebook — that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called applications ("apps"), which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

       d.     *A solid-state drive* ("SSD"), also known as a solid-state disk, is a data storage device that uses integrated circuit assemblies as memory to permanently store data instead of using rotating platters.

       e.     *Portable Media Players.*  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

       f.     *Routers and Modems.*  Computer routers and modems are also used as instrumentalities of crimes.  Modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet, and some have separate digital storage capacity that allow them to connect to other devices and to store information similar to an external digital storage device like a flash card or thumb drive.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device or the computers and devices connected to it.

6

      g.    *Digital Cameras.*  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable digital storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media includes various types of flash memory cards and miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos such as texts, word processing documents, or web pages.  If the camera is equipped with GPS technology, that information may be recorded as metadata associated with the photographs and videos taken with that camera as well as other information such as the make and model of the camera and the date and time the image was created.  Some cameras and removable storage media are now equipped with wireless capabilities, which allow for images and files to be uploaded from the camera or digital storage media directly to the Internet or to other digital storage devices or computers using a wired or wireless connection.

      15.    "Computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and can include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

      16.    Based on my knowledge, training, and experience, I know that computers and digital storage devices can store information for long periods of time.  Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device.  This information can sometimes be recovered with forensic tools.

      17.    Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

      18.    There is probable cause to believe that things that were once stored on the SUBJECT DEVICES may still be stored there, for at least the following reasons:

      a.    Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

      b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file— for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

19.     *Forensic evidence*.  As further described in ATTACHMENT B, this application seeks permission to locate not only electronically stored information on the SUBJECT DEVICES that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICES were used, the purpose of the use, who used the SUBJECT DEVICES, and when the SUBJECT DEVICES were used.  There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICES because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.  This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

b.      Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage

8

device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.      I know that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit the SUBJECT CRIMES may contain: internet searches/activity and social media activity involving drug deals, meeting places, correspondence with suppliers and customers, financial transactions related to drug dealing, information about bank accounts where drug proceeds are stored; correspondence with others, to possibly include additional drug associates, location information relevant to drug transactions, photographs of drug-related activity, including photographs of others engaged in drug use, and photographs of drugs and money; records of internet searches/activity related to drug activity or of GUTIERREZ's drug associates; records and information describing GUTIERREZ's state of mind during the time period set forth below.

g.      I also know that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

h.      The size of the electronic storage media (commonly referred to as a hard drive) used in smartphones has grown tremendously within the last several years.  Phones containing hard drives with a capacity of 64 gigabytes are not uncommon.  These drives can store thousands of images and videos at very high resolution.  Magnetic storage located in host computers adds another dimension to the equation.  It is possible to use a video camera to capture an image, process that image in a computer with video capture capabilities, and save that image to storage in another country.  Once this is done, there is no readily apparent evidence at the "scene of the crime".  Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

20.      *Need to review evidence over time and to maintain entirety of evidence.*  I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in ATTACHMENT B in order to prevent unnecessary invasion of privacy and overbroad searches.  I advise it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a

consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in ATTACHMENT B.  In order to obtain the full picture and meaning of the data from the information sought in ATTACHMENT B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

21.     *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the SUBJECT DEVICES consistent with the warrant.  The warrant I am applying for would authorize a later examination and perhaps repeated review of the SUBJECT DEVICES or information from a copy of the SUBJECT DEVICES consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the SUBJECT DEVICES to human inspection in order to determine whether it is evidence described by the warrant

## THERE IS PROBABLE CAUSE TO BELIEVE THAT EVIDENCE, FRUITS AND INSTRUMENTALITIES OF THE SUBJECT CRIMES EXIST ON THE SUBJECT DEVICES

22.     During the review of the reports associated to this case, I learned that a search warrant was obtained on May 16, 2017, by the Westminster Police Department (WPD) for the search of the devices, including TARGET TELEPHONE ONE, Target Telephone Two, and Target Telephone Three that were located at the Commerce City Police Department (CCPD).  On the same date, WPD Officer Brian Adams contacted the CCPD Property/Evidence unit and retrieved the SUBJECT DEVICES.  He then transported them to the WPD where he photographed each device and began executing the warrants by extracting data using Cellebrite UFED4PC.

23.     Officer Adams advised in his report that TARGET TELEPHONE ONE was heavily damaged. The screen was inoperable so he was unable to change the settings necessary to perform a full extraction of the device. Officer Adams was able to extract some data via Partial File System and SIM Card extractions.

24.      Officer Adams advised in his report that he was able to extract data from Target

Telephone Two via Physical (Bootloader), File System (EFS), and Logical Extractions.

25.     Officer Adams advised in his report that Cellebrite UFED4PC did not recognize TARGET TELEPHONE ONE and his attempts to extract data using numerous similar device profiles were unsuccessful. Officer Adams advises he was only able to extract data from the SIM card on TARGET Telephone Three.  Officer Adams advises he also did not perform an examination of any of the devices.

26.     On April 23, 2020, I reviewed the partial extractions of the cellular phone data retrieved by Officer Adams.  The reports had very limited information.  Specifically, the extraction was unable to determine the cellular phone numbers associated with each of the devices described above, including TARGET TELEPHONE ONE.

27.     On May 8, 2020, I discussed and shared the extraction reports with FBI Digital Operations Specialist Nicholas Hanggi.  DOS Hanggi observed that the initial extractions of TARGET TELEPHONE ONE, Target Telephone Two and Target Telephone Three were done with a Cellebrite UFED 4PC version 6.1.0.140 with limited results.  Officer Adams' extraction reports indicate that Cellebrite UFED Physical Analyzer version 6.1.6.19 was used to process the extractions.  DOS Hanggi advised both versions of Physical Analyzer and 4PC are out-of-date relative to today's versions as the most recent FBI-approved versions of these tools are 7.31.0.222 and 7.28.2.8, respectively.  DOS Hanggi also noted the extraction reports did not indicate the device's phone numbers. DOS Hanggi advised it may be possible to retrieve additional information if more recent versions of the Cellebrite tools were used.

28.     On June 5, 2020 I obtained the ORIGINAL WARRANT.  On the same date, I executed the warrant at the Thornton Police Department, 9551 Civic Center Drive, Thornton, Colorado and took custody of the TARGET TELEPHONE ONE.  Because the phone had a broken screen, I ordered a replacement screen and provided it to FBI IT Specialist Nicholas Hanggi to replace the screen.  After receiving and replacing the screen, IT Specialist Hanggi attempted to download TARGET TELEPHONE ONE.  Because the phone was password protected, he was unable to access the phone's contents.  On August 24, 2020, I transferred the phone to the RMRCFL in attempt to have one of the examiners download the phone using additional forensic tools.  On or about September 1, 2020, I spoke with FBI Forensic Examiner James Stephens who advised TARGET TELEPHONE ONE was an older model and the current Cellebrite system was unable to bypass the password that would enable a search of the phone.  As set forth above, I have since been advised by the FBI forensic examiner at the RMRCFL that they may be able to bypass the phone's security features using a tool they call In-System Programming" or "ISP," which is a technique that is used to solder components to the phone allowing for access.  This technique involves disassembling the TARGET TELPEHONE ONE by melting the solder on the board to loosen the memory and then extracting the memory card to play it in a memory card reader. While this method has been useful in the past, using this technique will render the TARGET TELEPHONE ONE inoperable.  I therefore seek specific authorization to use this technique.

## CONCLUSION

29.     Based on the investigation described above, probable cause exists to believe that inside

TARGET TELPEHONE ONE (described on ATTACHMENT A), will be found evidence, fruits, and instrumentalities of a violation of the SUBJECT CRIMES (described on ATTACHMENT B). I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of TARGET TELEPHONE ONE described in ATTACHMENT A for the items listed in ATTACHMENT B, using the technique described above in paragraphs 3 and 28.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

_s/ Stephanie Benitez_____
Stephanie Benitez, Special Agent
FBI

SUBSCRIBED and SWORN before me this 14th day of October, 2020.

_Michael E. Hegarty_____
HON. MICHAEL E. HEGARTY
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed by Assistant United States Attorney Bryan David Fields and U.S. Department of Justice Public Integrity Section Trial Attorney John Taddei and is submitted by Bryan David Fields.

12

**ATTACHMENT A**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

The following device, hereinafter and in ATTACHMENT B described as TARGET TELPHONE ONE

a. TARGET TELEPHONE ONE, marked as TPD evidence item #403877 and described as a Samsung Cell Phone (Broken), Model: SM-J120AZ UD, IMEI: 356903080225449, S/N: R58J13G8FJK.  This item was found near where the incident occurred and initially collected by Commerce City Police Department (CCPD) on 03/17/2017, transferred to TPD on 8/29/2017, and transferred to the FBI on June 5, 2020.  It is currently located at the RMRCFL.

13

## ATTACHMENT B

## <u>DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED</u>

For TARGET TELPEHONE ONE listed and described in Attachment A, the following items, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of Federal drug laws, including 21 U.S.C. § 841(a) and (b)(1) (Manufacturing, distributing, or possession with intent to manufacture or distribute a controlled substance); 21 U.S.C. § 843(b) (Use of a Communication Facility in a Drug Crime);  21 U.S.C. § 846 (Conspiracy to commit a controlled substance offense) **(hereinafter "Subject Offenses")**:

1. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of **Subject Offenses**:

2. Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the SUBJECT DEVICES or by other means for the purpose of committing violations of **Subject Offenses**.

3. Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of **Subject Offenses**.

4. Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of **Subject Offenses**.

5. Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses pertaining to violations of **Subject Offenses** or that show who used, owned, possessed, or controlled the SUBJECT DEVICES.

6. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to use or ownership of the SUBJECT DEVICES, or that aid in the identification of persons involved in violations of **Subject Offenses**.

7. Credit card information, bills, and payment records pertaining to violations of **Subject Offenses**.

8. Information about usernames or any online accounts or email addresses or related IP addresses used to commit the **Subject Offenses**.

9. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of **Subject Offenses**.

10. Information, records, documents, correspondence and notes, in any format and medium showing the state of mind of the user of the SUBEJCT DEVICES as it relates to the **Subject Offenses**.

11. Evidence of who used, owned, or controlled the SUBJECT DEVICES to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence.

12. Evidence of software that may allow others to control the SUBJECT DEVICES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security provisions or software designed to detect malicious software or unauthorized use of the device, and evidence of the lack of such malicious software.

13. Evidence of the attachment to the SUBJECT DEVICES of other storage devices or similar containers for electronic evidence.

14. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the SUBJECT DEVICES.

15. Evidence of how and when the SUBJECT DEVICES were used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

16. The telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the SUBJECT DEVICES.

17. Passwords, encryption keys, and other access devices that may be necessary to access the SUBJECT DEVICES.

18. Contextual information necessary to understand the evidence described in this attachment.

DEFINITIONS:

19. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies)

USE OF INVASIVE TECHNIQUE

20.     The agents executing this warrant are specifically authorized to use invasive tools that may render the device inoperable, including In-System Programming" or "ISP," or other similar technique involving  the disassembly of TARGET TELPEHONE ONE and efforts to use soldering and other methods to obtain access to components containing the information described above..